## DOUGLAS *vs.* MERCELES and others.

1. Where six of seven associates in a purchase of land on speculation, each agreed to take a specified number of the twelve and a half shares in which the scheme was divided, at a fixed price per share, and also agreed to take the shares in the scheme that might remain unsold, each in proportion to the shares taken by him, at the same price per share, and another associate subscribes for a half share, but refuses to enter into the agreement to take a proportion of unsold shares, the owner of the half share is not entitled, on winding up and settling the scheme, to any part of the unsold shares or of the profits on them.

2. And, on the other hand, the shareholders who agreed to purchase them, are bound to pay and account for the full price of those unsold shares and the interest on that price, out of their own funds, and cannot have any part of the profits in the scheme appropriated to pay for those shares before these profits are divided.

---

Argued on final hearing, upon pleadings and proofs.

*Mr. A. B. Woodruff,* for complainant.

*Mr. J. Van Blarcom,* for defendants.

THE CHANCELLOR.

The defendant, Cornelius Van Winkle, on the 28th day of August, 1866, entered into a written agreement with the complainant and Merceles, Goetschins, Scott, Bell, and Hewson, five of the defendants, that in consideration of $35,000 cash then paid him, and $90,000 to be paid, he would convey to them his farm in Passaic county. And these purchasers agreed that they would pay him said $90,000 in the manner therein stipulated, with interest, to be paid half-yearly, until the whole was paid. This $90,000 was to be

paid by the sale of lots by the associate purchasers, which Van Winkle agreed to convey at their request, (provided it was for reasonable prices,) upon receiving the whole proceeds on account. When $100,000 was paid on the whole, he agreed to convey the residue of the farm and take a mortgage for the balance with interest, payable in two years.

At the time of this contract there was a verbal understanding that the purchase was to be divided into twelve and a half shares of $10,000 each, and it was expected and intended that other persons could be induced to associate themselves with the purchasers and take shares. It was also understood verbally, that the complainant would assume but half a share, and that Merceles, Bell, and Scott would each assume one share and a half, and that Goetschins and Hewson would each assume one share. And in this proportion each paid in his part of the $35,000—that is, the complainant paid $2500, Merceles, Bell, and Scott, each paid $7500, and Goetschins and Hewson, each $5000.

Some weeks afterwards the agreement was reduced to writing, and two papers were drawn and executed for the purpose of manifesting it. Cornelius Van Winkle had been admitted by the associated purchasers to become one of their associates in the speculation, and to hold one share or $10,000 in the scheme. He paid his part of the first installment by endorsing on the article of sale a receipt for $5000 in cash, thus making the amount paid $40,000, instead of $35,000, and leaving the amount to be paid, $85,-000.

The first of these two papers stipulated that the purchase should be divided into twelve and a half shares of $10,000 each, and that the parties signing it each assumed to take and pay for at that rate, each share or part of a share set opposite his name. And each one further agreed that if the whole number of twelve and a half shares should not be subscribed for, that he should take and pay for a part of the remaining shares, or parts of shares, in the ratio or proportion of the shares subscribed for by him. And it was agreed

that all costs, expenses, and disbursements, losses, gains, increase, and emoluments should be suffered, borne, paid, divided, and distributed among the subscribers in the ratio and proportion of the shares and interest of each of the subscribers.

This writing was signed by Merceles, Bell, and Scott, respectively, with one and a half shares, and by Goetschins, Hewson, and Van Winkle, with one share each. The complainant declined signing it, though urged by the others, on the ground that he was not willing to assume the responsibility for more than one-half share, the amount for which he originally had agreed. He feared that the speculation would be unsuccessful; that Van Winkle would get the property back, and might call upon them for the balance of the consideration according to their interest, and he was not willing to assume more than the one-twenty-fifth, which he had assumed.

A second paper was therefore drawn by the consent of all, which he executed, limiting his rights and responsibilities. It was in the same language as the first, except the clause which bound the subscribers to take and pay for the remaining shares, and it declared that the rights and liabilities of the subscribers to it should be as determined by that, and the paper signed by Merceles, Bell, and others.

The associates sold lots to the amount of $63,724.53, which was received by Van Winkle, and on the 1st day of November, 1867, Van Winkle, at their request, conveyed the part of the farm which was still unsold to "The Riverside Land Improvement Company" for $84,500, and took from the company a mortgage for $22,000, the amount of the purchase money yet due to him.

The Riverside Land Improvement Company was a corporation formed by and composed of the associates in the purchase from Van Winkle. Since the purchase, Jacob Merceles and James Bell had each transferred one-half share to Daniel H. Winfield.

The agreement was that the lands should be conveyed to this land company for its stock, being twelve hundred and fifty shares nominally of $50 each, and that this stock should be divided among the associates according to their interests in the property conveyed.

The counsel of the company undertook to adjust the division of this stock among the associates. He considered that the four and a half shares not otherwise taken, belonged to the persons who subscribed the first agreement for the division of the shares of the Van Winkle farm, and gave to each half share of the seven and a half shares of the subscribers to that paper, one-fifteenth of the four and a half shares not otherwise taken.

On this assumption he apportioned one hundred and sixty shares of the land company's stock to Cornelius Van Winkle, to James Bell, and to John I. Goetschins, and to Jacob Merceles in his own right, and to him as trustee of Mrs. Hewson—each of these owning one share of the association. To Francis Scott, who owned one and a half shares, he apportioned two hundred and forty shares of this stock, and to the complainant as owner of a half share of the association he apportioned fifty shares of the company's stock. Each of the persons at the organization of the new corporation subscribed for the number of shares so apportioned to him.

The complainant insists that this apportionment was unjust, and that he is entitled to have a greater number of shares of the new company. He insists that the other seven subscribers were not entitled to the four and a half shares not taken, but that he is entitled to his proportion of them. And that if they were entitled to them they were bound to pay for them out of their own funds, and were not entitled to have them delivered to them paid for out of the funds of the first association.

The original agreement of Van Winkle standing by itself, would have entitled Douglas to one-sixth of the whole farm. But if, at the time, there was an understanding that he was to

have and to be liable for only one-twenty-fifth of it, and this was acted upon in the payment of the shares, that in equity would have protected him, as between the purchasers, from his liability beyond that amount. And when that agreement was reduced to writing and signed by all the parties, it clearly, as between themselves, fixed their rights and liabilities. Of the effect of these papers there can be no doubt. They are drawn with clearness and precision. They entitle each one of the parties to the share of the property for which he subscribed, and made him liable for that proportion of losses and liabilities. The subscribers to the first paper became bound to take and to pay for the four and a half shares not taken, in the same way as they were bound to pay for the share attached to their names; and, on the other hand, they were entitled to have these shares. Douglas, by signing the second paper, was liable only for his half share. His being liable for or entitled to nothing beyond this half share, does not depend merely on his refusing to sign the first document, but on the closing words of the paper that he signed, which state that his interest and liability shall be in the ratio determined and settled by that paper and the paper signed by the other associates. Douglas so understood it. The bait of the profits was held out by the others, but Douglas did not believe in any profits; he had lost confidence in the speculation, and, like a prudent man, was not willing to make himself liable for more than he was already liable for. He rightly apprehended what the others did not see, that if the scheme was a failure he would be liable for losses in proportion to his interest. I can see no fraud practiced on him by the others. He was, perhaps, over-cautious: at all events, as it turned out, those that had faith in it were right. But one cannot protect himself by his over-cautiousness, and then ask for a share of the profits of his less prudent associates, who chose to run the risk and who have made the profits. I am of opinion that the complainant is not, by the agreement, entitled to any part of these four and a half shares in the original association.

But the associates who signed the first agreement were by it clearly bound to pay for the four and a half shares out of their own funds. The agreement is clear and explicit to that effect; it could not well be more so. The agreement of Van Winkle to sell was no part of that agreement; it cannot be held to qualify or alter it. On the other hand this agreement made after the other, if there is any difference, must be held to qualify and alter the first agreement. The stipulation of each one to take and pay for his proportion of the remaining shares, would, if the association were to pay for them, be of no use—mere verbiage and nonsense. If the association paid for them out of the proceeds of sales, the subscriber could not and would not pay for them, and the whole clause would be an agreement to accept as a gift these valuable shares after the associates had paid for them. This construction is too absurd to be entertained, especially as it is against the clear words of the agreement. Van Winkle could not demand the principal of the fund of these shares until it was raised by sales. But when it was raised by sales, the price of these four and a half shares should have been taken out of the share of the proceeds of sales belonging to the owners of these shares, and charged to them. It was not so charged. The amount that should have been so charged is $45,000, the value of these shares. But as the one-half of the price of each share, including that of Douglas, has been paid out of the sales without being charged, the wrong done to Douglas was only to one-half of that amount, or $22,500, and as his interest in the whole scheme was one-twenty-fifth, the individual loss to him was $900, or the one-twenty-fifth of $22,500. The owners of the seven and a half shares for the same reason received $900 more of the property when sold to the company, than they were entitled to. This $900 represents eighteen shares at $50 each. If we deduct the mortgage of $22,000 from $84,500, the price at which the property was conveyed, the same result will be arrived at; the $62,500 left will give twelve hundred and fifty shares of $50 each, of

which the complainant was entitled to fifty by virtue of his owning one-twenty-fifth, and to eighteen by his claim of $900.

If an account is taken of the interest on the four and a half shares not paid by the owners, I think that the claim of the complainant to more than eighteen shares of the stock of the Riverside Land Improvement Company will be shown.

It must be referred to a master to take an account on the principles above declared, of the amount due from the defendants, Merceles, Bell, Scott, Goetschins, Winfield, Hewson, and Van Winkle, for the interest on one-half of the value of the four and a half shares at $10,000 each, which, added to $22,500, is the amount of which one-twenty-fifth must be charged to them, and for which the complainant is entitled to a decree in the stock of the company at its real market value at the time of the conveyance; and it must be referred to the master to ascertain and report that value.